**ARIS GLOVES, Inc.**

v.

**UNITED STATES.**

**C. D. 1854;  Protest No. 188742–K.**

United States Customs Court,
First Division.

March 12, 1957.

Mary Rehan and Brooks & Brooks,
New York City (Thomas J. McKenna,
Associate Counsel, New York City, of
counsel), for plaintiff.

George Cochran Doub, Asst. Atty.
Gen., Richard E. FitzGibbon, Trial Atty.,
New York City, for defendant.

Before OLIVER, Chief Judge, and
MOLLISON and WILSON, Judges.

WILSON, Judge.

The parties hereto have entered into
the following stipulation of facts (plaintiff's exhibit 5):

"It Is Hereby Stipulated and
Agreed by and between the parties
hereto:

"1. That the merchandise here involved consists of women's gloves in
chief value of leather, seamed in
part by hand and in part by machine, not lined and not trimmed
with fur and not over twelve inches
long;

"2. That said gloves were assessed with duty at the rate of 35 per
centum ad valorem under paragraph
1532(a) Tariff Act of 1930, as
amended by the Torquay Trade
Agreement, T. D. 52739;

"3. That said Torquay Trade
Agreement provided for an upward
modification of the rate of duty on
leather gloves of the type here involved;

"4.  That prior to the said Torquay Trade Agreement, T. D. 52739,
the said gloves were dutiable under
paragraph 1532(a) of the Tariff
Act, as modified by the General
Agreement on Tariffs and Trade
under T. D. 51802, under the provision for 'other' at 25 per centum
ad valorem, which provided as follows:

"1532(a) Gloves made wholly or in chief value of leather, whether wholly or partly manufactured:

\* \* \* \* \* \*

"If men's gloves ............................. 25% ad val.
"If women's or children's gloves:
   "Machined, seamed, not lined and not trimmed with fur:
      "Not over twelve inches in length .......... 40% ad val.
      "Over twelve inches in length ...............35% ad val.
   "Hand seamed, not lined, and not trimmed with fur:
      "Not over twelve inches in length ............... 35% ad val.
      "Over twelve inches in length ................. 30% ad val.
   "Other ...................................... 25% ad val.

"5. That under the Torquay Agreement aforesaid the provision for 'other' under the General Agreement on Tariffs and Trade was withdrawn and the rate of duty on said gloves which were seamed in part by hand and in part by machine and were not lined and were not trimmed with fur, and were not over twelve inches long, was fixed at 35 per centum as follows:

"1532(a) Gloves made wholly or in chief value of leather, whether (part) wholly or partly manufactured:

"(Geneva)

\* \* \* \* \* \*

"*Provided further,* That the foregoing shall be dutiable at not less than the following rates:

\* \* \* \* \* \*

"If women's or children's gloves:

\* \* \* \* \* \*

"Other ............ Withdrawn

"1532(a) Gloves made wholly or in chief value of leather, whether wholly or partly manufactured, if women's or children's (except machine seamed gloves, not lined, and not trimmed with fur, and except hand seamed gloves, not lined, and not trimmed with fur), shall be dutiable at not less than the following rates:

"Seamed in part by hand and in part by machine, not lined and not trimmed with fur:
"Not over 12 inches
    long .......... 35% ad val.

"Over 12 inches
    long ...........30% ad val.
'Other ..............25% ad val.

"6. That the time negotiations were undertaken for the Torquay Trade Agreement, namely, April 11, 1950. Executive Order 10082 of October 5, 1949, (14 F.R. 6105) provided as follows:

\* \* \* \* \* \*

"4. Before entering into the negotiation of a proposed trade agreement under the Trade Agreements Act, as amended, the Trade Agreements Committee shall submit to the President for his approval a list of all articles imported into the United States which it is proposed should be considered in such negotiations for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment. Upon approval by the President of any such list, as originally submitted or in amended form, the Trade Agreements Committee shall cause notice of intention to negotiate such agreement, together with such list of articles, to be published in the Federal Register. Such notice and list shall also be issued to the press, and sufficient copies shall be furnished to the Committee for Reciprocity Information for use in connection with such hearings as the Committee may hold with respect

thereto. Such notice, together with the list or a statement as to its availability, shall also be published in the Department of State Bulletin, Treasury Decisions, and the Foreign Commerce Weekly.

\* \* \* \* \* \*

"7. The notice of the Trade Agreements Committee was published in the May 15, 1950 issue of the Department of State Bulletin (Vol. XXII, No. 567, pp. 763–764) but neither the list nor a statement as to its availability was printed and the notice was also published in the Foreign Commerce Weekly on April 24, 1950, pp. 37 et seq., and it specified where the list could be obtained;

"8. That neither notice of intention to negotiate nor the list of articles subject to negotiation was published in the Treasury Decisions.

"9. That notice of intention to negotiate and a list of articles subject to negotiation were published in the Federal Register on April 14, 1950 (15 F.R. 2114).

"10. It is further stipulated and agreed that the three pamphlets marked '1,' '2' and '3' and initialed 'TJ–McK' and 'REFG' may be received in evidence with particular reference to pages numbered '1' '2' '3' and '73' in '1,' page numbered '13' in '2' and pages numbered '12' and '13' in '3.'

"11. It is further stipulated and agreed that State Department Publication No. 4209, Commercial Policy Series 135, released May 1951, entitled '(Preliminary)' 'Analysis of Torquay Protocol of Accession, Schedules, and Related Documents' with particular reference to pages 361, 456 and 457 be received in evidence."

The facts being thus conceded, the only question presented to the court for determination is one of law.

The importation now before the court, which consists of women's gloves, specifically described in the foregoing stipulation, was classified under paragraph 1532(a) of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 1532(a), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, and assessed with duty at 35 per centum ad valorem. Plaintiff claims the gloves in question dutiable at the lower rate of 25 per centum ad valorem provided for in paragraph 1532 (a) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.

Since the provision for gloves, partly seamed by hand and partly by machine, providing duty at 25 per centum ad valorem under the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, supra, was withdrawn, the collector assessed the imported merchandise under the provision of said act, as modified by the Torquay protocol, supra, providing duty at the rate of 35 per centum ad valorem on such gloves.

■ The plaintiff concedes that, if the Torquay protocol is valid, the gloves in question were properly classified and were dutiable at the rate of 35 per centum ad valorem, as assessed. It is contended by the plaintiff, however, that the Torquay Protocol to the General Agreement on Tariffs and Trade, supra, is invalid, because it was negotiated before reasonable public notice of the intention to negotiate such an agreement had been given. Both parties hereto, therefore, agree that the sole inquiry now before the court is whether reasonable public notice of the intention to negotiate the Torquay protocol, supra, was given, insofar as it affects the status of the merchandise now under consideration, before said agreement was concluded.

At the time of the negotiation of the Torquay protocol, supra, section 4 of the Trade Agreements Act of 1934, as amended (63 Stat. 698), 19 U.S.C.A. § 1354, provided as follows:

"Before any foreign trade agreement is concluded with any for-

eign government or instrumentality thereof under the provisions of this Act, reasonable public notice of the intention to negotiate an agreement with such government or instrumentality shall be given in order that any interested person may have an opportunity to present his views to the President, or to such agency as the President may designate, under such rules and regulations as the President may prescribe; and before concluding such agreement the President shall seek information and advice with respect thereto from the United States Tariff Commission, from the Departments of State, Agriculture, and Commerce, from the National Military Establishment, and from such other sources as he may deem appropriate."

It is conceded that, at the time of the negotiation of the Torquay protocol, supra, Executive Order 10082, dated October 5, 1949 (14 F.R. 6105), 19 U.S.C.A. § 1351 note, was in effect and provided as follows:

"4. Before entering into the negotiation of a proposed trade agreement under the Trade Agreements Act, as amended, the Trade Agreements Committee shall submit to the President for his approval a list of all articles imported into the United States which it is proposed should be considered in such negotiations for possible modification of duties and other import restrictions, imposition of additional import restrictions, or specific continuance of existing customs or excise treatment. Upon approval by the President of any such list, as originally submitted or in amended form, the Trade Agreements Committee shall cause notice of intention to negotiate such agreement, together with such list of articles, to be published in the FEDERAL REGISTER. Such notice and list shall also be issued to the press, and sufficient copies shall be furnished to the Committee for Reciprocity Information for use in connection with such hearings as the Committee may hold with respect thereto. Such notice, together with the list or a statement as to its availability, shall also be published in the Department of State Bulletin, Treasury Decisions, and the Foreign Commerce Weekly."

Although the foregoing order is quoted verbatim in the stipulation of the parties, supra (plaintiff's exhibit 5), it is repeated here to show that the words "Federal Register" were in solid capital letters in the original order and not in small letters, as set forth in the stipulation.

We then come definitely to the question of whether the notice which was given by the Trade Agreements Committee of the intention to negotiate the Torquay protocol, supra, constituted reasonable public notice of its intention to negotiate according to law. If that inquiry be answered in the affirmative, then, it is conceded by the plaintiff that its goods were properly classified and assessed, and no further consideration of the case will be necessary.

Obviously, the plaintiff is not in the position of one who is entitled to personal notice of a proceeding, as would be the case had the Government instituted some type of individual suit against the plaintiff. In other words, we are not here confronted with the question which would arise out of the failure to serve process in a regular lawsuit. Our concern is with a notice to the general public, or to that portion thereof which might be affected by the Torquay negotiations.

Evidently, no contention is or could be made that any failure to *issue* the list in question to the press or to furnish copies to the Committee for Reciprocity Information did or could affect the validity of the negotiations. Obviously, to issue such or any notice to a newspaper reporter does not mean that it will be printed, or that it will give notice to anybody. Furthermore, the furnishing of copies to the Reciprocity Committee, or the failure to furnish such

copies, could in no way affect the question of public notice. Clearly, therefore, not all the provisions of Executive Order 10082, supra, were intended as mandatory directions concerning notice. It is conceded that "notice of intention to negotiate and a list of articles subject to negotiation" were published on April 14, 1950, in the "Federal Register," and that the notice with a statement as to where the list could be obtained was published in the Foreign Commerce Weekly on April 24, 1950. Furthermore, the notice, without the list or a statement as to its availability, was published in the May 15, 1950, issue of the Department of State Bulletin (vol. XXII, No. 567, pp. 763–764). Neither the notice of intention to negotiate, nor the list of articles subject to negotiation, was published in Treasury Decisions.

It is upon this record that the plaintiff challenges the sufficiency of the notice given and contends that reasonable public notice, under the provisions of section 4 of the Trade Agreements Act of June 12, 1934, supra, was not given.

Plaintiff argues that when Congress enacted the Trade Agreements Act of 1934, supra, it attached to the grant of power the definite limitation that, before any foreign trade agreement could be concluded, reasonable public notice had to be given. Up to that point, we agree with plaintiff's position. However, the plaintiff further argues that said notice must, under the provisions of said Trade Agreements Act, be given "under such rules and regulations as the President may prescribe." It is then contended by counsel for plaintiff that, before the negotiating committee could be vested with authority to proceed with its negotiations, and before the President could conclude the agreement in question by proclamation, it was mandatory that "the Trade Agreements Committee should publish both a notice of intention to negotiate such an agreement and a list of the articles to be the subject of such negotiation in the Federal Register and that such notice and list (or a statement as to its availability) should also

be published in (a) the Department of State Bulletin; (b) the Treasury Decisions; and (c) the Foreign Commerce Weekly." Failure of the committee to publish the notice in question with the involved list or a statement of its availability in each and every one of the publications, heretofore enumerated, was, according to plaintiff's position, fatal to the validity of the trade agreement and the proclamation putting it into effect.

On the other hand, it is contended by the Government that the only mandatory provision of the law and of the Presidential proclamation requiring notice is that said notice (with the involved list) be published in the "Federal Register." Such publication was admittedly made.

Section 308, title 44, U.S.C., 44 U.S. C.A. § 308, provides as follows:

"Whenever notice of hearing or of opportunity to be heard is required or authorized to be given by or under an Act of the Congress, or may otherwise properly be given, the notice shall be deemed to have been duly given to all persons residing within the continental United States (not including Alaska), except in cases where notice by publication is insufficient in law, if said notice shall be published in the Federal Register at such time that the period between the publication and the date fixed in such notice for the hearing or for the termination of the opportunity to be heard shall be (a) not less than the time specifically prescribed for the publication of the notice by the appropriate Act of the Congress; or (b) not less than fifteen days when no time for publication is specifically prescribed by the Act, without prejudice, however, to the effectiveness of any notice of less than fifteen days where such shorter period is reasonable."

From this statute, it appears that Congress has provided that "Whenever notice of hearing or of opportunity to be heard is required or authorized to be given by or under an Act of the Congress * * * the notice shall be deemed to

have been duly given * * * if said notice shall be published in the Federal Register * * *."

Section 305, title 44, U.S.C., 44 U.S.C.A. § 305, directs: "There shall be published in the Federal Register * * * such documents or classes of documents as may be required so to be published by Act of the Congress." Section 307 of title 44 U.S.C., 44 U.S.C.A. § 307, provides for the filing of originals or certified copies of documents which have been published in the Federal Register and "unless otherwise specifically provided by statute, such filing of any document, required or authorized to be published under section 305 of this title, shall, except in cases where notice by publication is insufficient in law, be sufficient to give notice of the contents of such document to any person subject thereto or affected thereby."

The Government maintains that the plaintiff places a wrong construction on section 4 of the Trade Agreements Act, supra, when the plaintiff insists that the words "under such rules and regulations as the President may prescribe" are related back to the words "reasonable public notice." There appears to be merit in Government's contention that the clause "under such rules and regulations as the President may prescribe" modifies not the clause "reasonable public notice of the intention to negotiate an agreement" but the clause immediately preceding it, that is, "an opportunity to present his views to the President, or to such agency as the President may designate, under such rules and regulations as the President may prescribe." If this be the proper construction of the statute in question, then, the rules and regulations referred to are those relating to the method by which interested parties are to present their views at the hearing.

While, as heretofore noted, the President, under Executive Order 10082, supra, did direct that, before entering into negotiations for trade agreements, the Trade Agreements Committee should give certain notice, yet, it would appear from the reading of the Presidential proclamation putting into effect the Torquay Protocol to the General Agreement on Tariffs and Trade (Proclamation 2929 of June 7, 1951, U.S.Code Congressional and Administrative Service, 82nd Cong., 1st Sess., 1951, p. 910, T.D. 52739) that the President, himself, considered the notice given to be sufficient, for, in paragraph 4 of the aforesaid proclamation, the President declares that:

"4. Whereas reasonable public notice of the intention to conduct trade-agreement negotiations with the governments of the countries other than the United States of America named in the third recital of this proclamation was given, the views presented by persons interested in such negotiations were received and considered, and information and advice with respect to such negotiations was sought and obtained from the United States Tariff Commission, the Departments of State, Defense, Agriculture, and Commerce, and from other sources; * * *."

Furthermore, under the same proclamation, the President recognizes the Federal Register as the medium through which notice of the effective date of the revised rates was to be published (see paragraph 9 of the foregoing proclamation).

It is enlightening to analyze paragraphs 4 and 5 under Part II—*Conclusion of Agreements*—of Executive Order 10082, relied upon by the plaintiff as prescribing the public notice to be given by the Trade Agreements Committee before entering into the negotiation of a trade agreement. In the first place, it is conceded that, if a list on which negotiations are to be based is approved by the President, the Trade Agreements Committee shall cause notice of intention to negotiate such agreement, together with such list of articles to be published in the "Federal Register." In the order, the name— Federal Register—is set forth in solid capital letters, very evidently for the purpose of distinguishing that publication from the others later mentioned in

the paragraph. Then, immediately following the direction that a notice shall be published in the Federal Register, occurs the statement "Such notice and list shall also be issued to the press, and sufficient copies shall be furnished to the Committee for Reciprocity Information for use in connection with such hearings as the Committee may hold with respect thereto." As hereinbefore pointed out, the stipulation between the parties is silent as to whether the notice and list with which we are concerned were issued to the press, and as to whether any copies were furnished for the use of the Committee for Reciprocity Information. Such an omission clearly was not an oversight, it being recognized that, whether or not the notice and list were issued to the press and whether or not copies were furnished the Reciprocity Information Committee, it could have no bearing whatever in resolving the question as to public notice.

Following the sentence in paragraph 4 of the order concerning the issue of the notice and the list to the press, and the furnishing of copies thereof for reciprocity information, is this final sentence: "Such notice, together with the list or a statement as to its availability, shall also be published in the Department of State Bulletin, Treasury Decisions, and the Foreign Commerce Weekly." However, it seems logical to assume that, had the President intended by that statement that the notice with the list of articles to be considered was to be published not only in the Federal Register but in the Department of State Bulletin, Treasury Decisions, and the Foreign Commerce Weekly, he would have worded his order somewhat as follows: "The Trade Agreements Committee shall cause notice of intention to negotiate such agreement, together with such list of articles, to be published in the Federal Register, in the Department of State Bulletin, Treasury Decisions, and the Foreign Commerce Weekly." Instead, he set apart the "Federal Register" as the one publication in which the agreement, together with the list of articles, was to be published. The direction for publication in the "Federal Register" did not provide for publishing the notice with a statement as to the availability of the involved list, but directed that the notice in the "Federal Register" must be accompanied by the list, with no alternative method prescribed. On the other hand, the notice to appear in the other three publications was "Such notice, together with the list or a statement as to its availability."

Inasmuch as Congress, by statutory enactment, has designated the "Federal Register" as the official publication in which notices by departments of the Federal Government shall appear and in view of the fact that, in the statutory enactments, heretofore referred to, Congress recognizes that, unless otherwise expressly provided by statute, a notice published in the "Federal Register" alone is reasonable public notice, and, in the light of the analysis, hereinbefore given of the Trade Agreements Act of 1934, as amended, and the Presidential proclamation, relied upon by the plaintiff, coupled with the fact that the President, himself, recognized the sufficiency of the notice given, we are of opinion and hold that reasonable public notice of intention to negotiate the Torquay protocol, supra, was given, and that such trade agreement became effective according to the provisions of Presidential Proclamation No. 2929, T.D. 52739, 86 Treas.Dec. 121, issued June 7, 1951. For the reasons stated, we deem it unnecessary to discuss the cases cited in the plaintiff's brief in support of its claim. Accordingly, the classification of the involved merchandise under the provisions of paragraph 1532(a) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, at the applicable rate of duty was proper. The protest is, therefore, overruled and judgment will be entered accordingly.

MOLLISON, Judge (dissenting).

I regret that I cannot agree with the view taken by my colleagues that the

notice caused by the Interdepartmental Committee on Trade Agreements to be published in the Federal Register of April 14, 1950, together with a list of articles which it was proposed should be considered, was, standing alone, sufficient compliance with the requirements of section 4 of the Trade Agreements Act, as amended, thus ignoring the regulations prescribed by the President in Executive Order No. 10082.

As I read section 4, supra, it requires that the President shall prescribe rules and regulations governing the entire procedure of administering the Reciprocal Trade Agreements Act, as amended, including the giving of notice and affording interested persons an opportunity to be heard. In other words, the statute did not attempt, either in and of itself or in conjunction with any other statute, to state what "reasonable public notice" would be, but merely provided that it should be given, and delegated to the President the authority to spell out precisely the form and extent of the notice, as well as the manner in which interested persons might present their views.

This view was apparently also the view of the President, for, in Executive Order No. 10082, he prescribed in great detail "Procedures for the Administration of the Reciprocal Trade-Agreements Program." If the Government and the majority are correct in their views, the promulgation of paragraph 4 of Executive Order No. 10082, governing the time, place, and content of such notices, as well as who should cause them to be published, was a completely useless act, and nobody had any right or reason to rely upon it as establishing the procedure which would be followed.

I do not believe that 44 U.S.C., section 308, 44 U.S.C.A. § 308, either was, or was intended to be, applicable to the situation. It is scarcely conceivable that, in view of the public considerations of high character which are involved in trade agreement administration, the President of the United States would have, by authorized and appropriate regulations, advised all interested parties that notice would be given through publication in five different organs or media, and yet, in the final analysis, it would be contended that publication in only one organ fulfilled the obligation of notice.

Section 308, supra, quite obviously is a certain type of catchall, designed to cover those situations where notice of hearing is required to be given by or under an act of Congress, but the exact time, form, and place of notice is not spelled out in the act or in a rule or regulation authorized under the act. It certainly was not intended to be an overall substitute for those situations wherein the nature of the notice as to time, form, and place is clearly set out in the act of Congress or in rules or regulations prescribed under such act.

When interpreted in the manner adopted by the majority herein, there is an imputation of what practically amounts to bad faith or overreaching, which must be ascribed to the legislators (including the Congress, or the President, when acting as the agent of the Congress). In the view of the majority, the Congress or the President may, in an act or a regulation, solemnly set forth the details of notice to be given to interested persons, including the fact that publication will be made in more than one place, and, yet, in effect, later repudiate the validity and effectiveness of such provision for multiple publication and rely upon section 308, supra, as providing for a single source of information on the subject. I do not think that this was the intention of the Congress which passed section 308, nor of the President when he promulgated Executive Order No. 10082.

In my view, the facts establish that a part of the procedure which was set up to administer the Reciprocal Trade Agreements Program, to wit, the notice prescribed by Executive Order No. 10082, was omitted in part. However, whether such omission constituted such a defect as would be fatal to the validity of the ensuing trade agreement and/or the

Presidential proclamation relating thereto, is another question which, in my opinion, has not had adequate treatment either in the proof or briefs submitted by the parties. It may very well be that such notice was an indispensable part of the procedure and essential to the validity of the trade agreement and Presidential proclamation which followed, or it may be otherwise, but, inasmuch as, in the present stage of the matter, a discussion of that issue would be largely academic, I do not address myself to that question, but rest my dissent upon disagreement with the view of the majority that the regulations prescribed by the President as to notice of intent to negotiate might be ignored.